

# ARKANSAS COURT OF APPEALS

DIVISION I
**No.** CV-15-252

| | |
|---|---|
| VICTORIA JANE FLEMING, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF SCOTT JAMES FLEMING AND ON BEHALF OF THE WRONGFUL DEATH BENEFICIARIES OF THE ESTATE OF SCOTT JAMES FLEMING<br>APPELLANT | **Opinion Delivered:** November 4, 2015<br><br>APPEAL FROM THE GARLAND COUNTY CIRCUIT COURT [NO.26CV-11-164]<br><br>HONORABLE LYNN WILLIAMS, JUDGE |
| V. | |
| KENNETH VEST, M.D.<br>APPELLEE | REVERSED AND REMANDED |

## WAYMOND M. BROWN, Judge

Appellant Victoria Jane Fleming, in her capacity as personal representative of the estate of her deceased husband, Scott James Fleming, appeals the August 15, 2013 order of the Garland County Circuit Court granting summary judgment in favor of appellee, Dr. Kenneth Vest, M.D. This case has reached our court twice before, but we were forced to remand to supplement the record and for lack of a final order.[1] Having found that appellant has cured the deficiencies that have kept us from considering the case earlier, we now address the merits of her appeal.

On April 19, 2010, Sam Lands shot and killed appellant's husband, Scott Fleming. Three years earlier Lands had been found not guilty of charges including battery, escape, resisting arrest, assault, and fleeing, by reason of mental disease or defect. He was treated at

---

[1] *Fleming v. Vest*, 2014 Ark. App. 327; *Fleming v. Vest*, 2014 Ark. App. 600.

the state hospital and then granted a five-year conditional release. Soon thereafter, with the approval of his initial treatment team, he transferred his treatment provider and residence to Community Counseling Services, Inc. (CCS) in Garland County. There he was diagnosed with bipolar disorder and began treatment. In 2009, appellee became his treating psychiatrist and, in order to determine the appropriate medication regimen, began to withdraw the level of pharmaceuticals administered to Lands. The final time appellee met with Lands before the death of Scott Fleming was on February 24, 2010.

On August 16, 2011, appellant filed a wrongful-death action against Lands, his parents, CCS, and its insurer. On April 19, 2012, exactly two years after the death of her husband, appellant amended her complaint to include appellee as a defendant. He answered and moved for summary judgment, arguing that appellant's claim was barred by the two-year statute of limitations set forth in the Arkansas Medical Malpractice Act[2] and that such a period began to run on the date he last met with Lands. Appellee also adopted a summary-judgment motion filed by CCS alleging that appellant's claims were barred by the doctrine of quasi-judicial immunity. Conversely, appellant argued that the two-year limitations period did not apply because her husband had been a third-party nonpatient, or alternatively, that she filed within the statutory period because it began to run on the day she acquired standing, when her husband was killed. She further argued that the statutory period was tolled because appellee was engaging in a continuous course of treatment with Lands. Finally, she contended that issues of fact remained which prevented granting the motion for summary judgment on the grounds of quasi-judicial immunity. Following a

---

[2] Ark. Code Ann. Title 16, Chapter 114.

hearing on the matter, the circuit court granted appellee's motions for summary judgment and dismissed all claims against him. This appeal followed.

> Our standard of review for summary judgment cases is well established. Summary judgment should only be granted when it is clear that there are no genuine issues of material fact to be litigated, and the moving party is entitled to judgment as a matter of law. The purpose of summary judgment is not to try the issues, but to determine whether there are any issues to be tried. We no longer refer to summary judgment as a drastic remedy and now simply regard it as one of the tools in a trial court's efficiency arsenal. Once the moving party has established a prima facie entitlement to summary judgment, the opposing party must meet proof with proof and demonstrate the existence of a material issue of fact. On appellate review, we determine if summary judgment was appropriate based on whether the evidentiary items presented by the moving party in support of the motion leave a material fact unanswered. We view the evidence in the light most favorable to the party against whom the motion was filed, resolving all doubts and inferences against the moving party. Our review focuses not only on the pleadings, but also on the affidavits and other documents filed by the parties. Moreover, if a moving party fails to offer proof on a controverted issue, summary judgment is not appropriate, regardless of whether the nonmoving party presents the court with any countervailing evidence.[3]

Appellant first argues that it was error for the circuit court to consider her claim under medical-malpractice statutes because her husband, the victim, was not appellee's patient. Rather, she contends her claim arises from the Restatement (Second) of Torts, which states as follows:

> One who takes charge of third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.[4]

---

[3] *Harvest Rice, Inc. v. Fritz and Mertice Lehman Elevator and Dryer, Inc.*, 365 Ark. 573, 575–76, 231 S.W.3d 720, 723 (2006) (internal citations omitted).

[4] Restatement (Second) of Torts § 319.

Her position is that, because her husband was not one of appellee's patients, she could not pursue a claim for medical malpractice. She cites *Thompson v. Sparks Regional Medical Center*[5] as standing for the proposition that a nonpatient can *never* pursue a claim for medical malpractice. This is a misreading. In *Thompson*, the plaintiff suffered injuries as the result of a motorcycle accident and immediately sought emergency treatment at St. Edward hospital. St. Edward was unable to render emergency aid to Ms. Thompson because no plastic surgeon was at the hospital at the time. She allegedly expressed a willingness to then transfer to Sparks Regional Medical Center, but never arrived there. She brought suit against St. Edward, Sparks, and multiple other parties under the Emergency Medical Treatment and Active Labor Act (EMTALA) and Arkansas's medical malpractice laws. The circuit court granted summary judgment in favor of Sparks because Ms. Thompson never went to the hospital for treatment. In affirming, the court of appeals reasoned that the definition of "medical injury" within our medical–malpractice law required that actual professional services be rendered in order for there to be a basis for a claim of malpractice.[6] Because no professional services were rendered by Sparks and because Ms. Thompson never went to that hospital for treatment, no professional services were rendered by which she could sue for malpractice. *Thompson* does not stand for the proposition that nonpatients are unable to sue for malpractice.

On the contrary, this analysis in *Thompson* actually supports appellee's contention that the death of Scott Fleming qualified as a "medical injury" and therefore, fell under the

---

[5] 2009 Ark. App. 190, 302 S.W.3d 35.

[6] *Id*. at 38.

auspices of medical malpractice. An "action for medical injury" is "any action against a medical care provider, whether based in tort, contract, or otherwise, to recover damages on account of medical injury."[7] The statute defines "medical injury" very broadly:

> (3) "Medical injury" or "injury" means any adverse consequences arising out of or sustained in the course of the professional services being rendered by a medical care provider to a patient or resident, whether resulting from negligence, error, or omission in the performance of such services; or from rendition of such serviced without informed consent or in breach of warranty or in violation of contract; or from failure to diagnose; or from premature abandonment of a patient or of a course of treatment; or from failure to properly maintain equipment or appliances necessary to the rendition of such services; or otherwise arising out of or sustained in the course of such services.[8]

Here, the allegation was that Scott Fleming's death occurred because of the professional services (or lack thereof) being provided to Samuel Lands by appellee. In recognizing the breadth of the definition of "medical injury," our supreme court has made it clear that a nonpatient third party may sue a medical care provider for injuries sustained as a result of a patient's improper treatment.[9] Accordingly, we find that Scott Fleming's death was a "medical injury" and falls under the Arkansas Medical Malpractice Act.

Because we have discerned the correct nature of the claim, we must now decide whether such a claim was barred by the medical-malpractice two-year statute of limitations.

---

[7] Ark. Code Ann. § 16-114-201(1) (Supp. 2015).

[8] Ark. Code Ann. § 16-114-201(3).

[9] *See Dodson v. Charter Behavioral Health Sys. of Nw. Ark., Inc.*, 335 Ark. 96, 983 S.W.2d 98 (1998) (stating that medical malpractice "lay at the very heart" of the plaintiff's claim when decedent was killed by a suicidal driver which went undiagnosed at the moment because of a breakdown in communication between the defendant hospital and patient).

(a) Except as otherwise provided in this section, all actions for medical injury shall be commenced within two (2) years after the cause of action accrues.

(b) The date of accrual of the cause of action shall be the date of the wrongful act complained of and no other time.[10]

This court reviews the circuit court's statutory interpretation de novo, because it is for this court to determine the meaning of a statute. The first rule of statutory construction is to construe the statute just as it reads, giving the words their ordinary and usually accepted meaning in common language. We construe statute so that, if possible, every word is given meaning and effect. If the language of a statute is clear and unambiguous and conveys a clear and definite meaning, it is unnecessary to resort to the rules of statutory construction. When a statute is clear, it is given its plain meaning, and this court will not search for legislative intent; rather, that intent must be gathered from the plain meaning of the language used. Statutes relating to the same subject should be read in a harmonious manner if possible.[11]

Here, the circuit court granted summary judgment citing appellee's argument that the statute-of-limitations period began the date of his last visit with Lands, February 24, 2010, rather than the date of Scott Fleming's death. Had the statutory period begun on April 19, 2010, her claim would be timely and would not be barred by the statute of limitations. She contends that there is a disconnect in the statutory language as it applies to patients versus nonpatients like her husband. Under the circuit court's interpretation, the statute of limitations began to accrue over one and one-half months before Lands ever shot Scott Fleming. She correctly points out on appeal that had she filed her claim prior to her husband's death, her husband would have had no relationship to appellee, he would not

---

[10] Ark. Code Ann. § 16-114-203(a), (b).

[11] *Roberson v. Phillips Cnty. Election Comm'n*, 2014 Ark. 480, at 4, 449 S.W.3d 694, 696 (internal citations omitted).

have been injured due to appellee's negligence, and the claim would have no possibility of surviving in court.

Although appellant's argument appears to have much merit, our case law tends to support the position of appellee, that the cause of action began to accrue at the time of his last visit with Lands.[12] In order to overcome this hurdle, appellant argues that the statute of limitations was tolled by the continuous-course-of-treatment exception. This exception tolls the statute of limitations in medical-malpractice cases where there is medical negligence "followed by a continuing course of treatment for the malady which was the object of the negligent treatment or act."[13] Our supreme court has further defined the exception:

> [I]f the treatment by the doctor is a continuing course and the patient's illness, injury or condition is of such a nature as to impose on the doctor a duty of continuing treatment and care, the statute does not commence running until treatment by the doctor for the particular disease or condition has terminated – unless during treatment the patient learns or should learn of negligence, in which case the statute runs from the time of discovery, actual or constructive.[14]

The record in the case at bar contains several instances, many included in the appellant's brief, where a jury might determine that appellee was engaged in a continuous course of treatment:

---

[12] *See Raynor v. Kyser*, 338 Ark. 366, 993 S.W.2d 913 (1999) (holding that a patient's cause of action against a doctor for medical negligence in failure to properly diagnose accrued at the time of the patient's last postoperative follow-up examination, as opposed to her treatment five months later with the same doctor for complaints for which she never before had sought treatment).

[13] *Tullock v. Eck*, 311 Ark. 564, 571, 845 S.W.2d 517, 521 (1993).

[14] *Pledger v. Carrick*, 362 Ark. 182, 188–89, 208 S.W.3d 100, 103 (2005).

Appellee became Lands's actual treating psychiatrist in January 2009, and he expected to treat Lands for two years.

As treating psychiatrist, appellee saw Mr. Lands on February 24, 2010. His progress note from that day listed Lands's diagnosis as Bipolar I Disorder and set future treatment goals for the disorder; listed multiple objectives that were to occur within ninety (90) days, or by May 24, 2010.

Appellee testified that he did not intend to abandon Lands after the February 24, 2010 visit; that he continued to monitor Lands after the visit; and that he had an appointment scheduled with Lands sometime after April 19, 2010.

Courtney Bishop, Lands's primary therapist at CCS, testified that, at the time of the shooting, she and appellee were still in the process of deciding what the medication regimen for Lands's condition should be.

Appellee executed a Master Treatment Plan/Certification of Serious Mental Illness for Lands on April 28, 2010, after Scott Fleming's death. In it, he stated that continuous treatment of the disorder was appropriate and medically necessary.

The circuit court failed to construe the foregoing facts in appellant's favor, which is required when determining whether to grant a motion for summary judgment. These facts concern a material issue in deciding if summary judgement is justified as a matter of law, and a jury could find that the treatment was continuous, and therefore, appellant filed her claim within the statutory period. Because material facts are in dispute as to whether appellee continuously treated Lands, summary judgment based on the statute of limitations was inappropriate. We reverse the grant of summary judgment based on the two-year statute of limitations.

In addition to granting the motion for summary judgment based on the statute of limitations, the circuit court also granted summary judgment in favor of appellee on a theory of quasi-judicial immunity by finding that appellee was a quasi-judicial officer.

Whether immunity from suit exists is a question of law for the courts.[15] We review questions of law de novo, as the circuit court is in no better position than we are to answer a question of law.[16]

In *Chambers v. Stern*,[17] the Arkansas Supreme Court stated that a "court-appointed physician is entitled to judicial immunity so long as he is serving an integral part of the judicial process, by carrying out and acting within the scope of the court's order." The physician in *Chambers* was ordered by the divorce court to meet, evaluate, and counsel the divorcing parties and their children; to report his findings, observations, and recommendations to the court; and to direct the divorcing parties' visitation with their children pending further order. Appellee's sole argument to support that he was acting as an "arm of the court and performing a quasi-judicial function"[18] is that the original court order became applicable to CCS after Lands transferred. The court orders never identify appellee, and he confirmed in his deposition that he never communicated with the circuit court. In light of our de novo review, we do not find that appellee is protected by judicial immunity as a matter of law.

Viewing the evidence in the light most favorable to appellant, resolving any doubts against appellee, we hold that the circuit court erred in finding that appellee was entitled to judgment as a matter of law.

---

[15] *Chambers v. Stern*, 338 Ark. 332, 338, 994 S.W.2d 463, 466 (1999).

[16] *Curley v. Old Reliable Cas. Co.*, 85 Ark. App. 395, 155 S.W.3d 711 (2004).

[17] *Chambers, supra.*

[18] *Id.*

Reversed and remanded.

ABRAMSON, J., agrees.

HARRISON, J., concurs.

**BRANDON J. HARRISON, Judge, concurring.** This appeal asks whether a treating psychiatrist may be liable to a nonpatient who is intentionally harmed by a patient. A core issue immediately arises: does the Medical Malpractice Act apply as a matter of course, as Dr. Vest has argued? Or does some other tort law apply—whether it be the typical negligence doctrine, or a more particularized version of negligence that many states have applied when faced with third-party harm cases? There is no clear answer or approach under Arkansas law, and that is why my colleagues and I diverge on a key issue in this case.

The circuit court granted summary judgment to Dr. Vest on two grounds: (1) it decided that the Act applied to the case and ruled that the Act's two-year statute of limitations time-barred Fleming's complaint against Dr. Vest; and (2) the court separately ruled that Dr. Vest had quasi-judicial immunity, a decision that, independent of the limitations issue, ended the case against the doctor.

We all agree that Dr. Vest has no quasi-judicial immunity and unanimously reverse the circuit court's immunity ruling as a matter of law. I differ, however, on the decision to characterize and analyze Fleming's case against Dr. Vest as one for alleged medical malpractice. Whether Arkansas's Medical Malpractice Act applies affects the limitations question presented in this case and aspects of this litigation's future course.

This case is not one for medical malpractice because it does not truly probe whether Dr. Vest properly treated a person with whom he had a doctor-patient relationship. This case turns, at least in part, on whether Dr. Vest owed a legal duty to control or confine patient Lands so as to protect Fleming, who was not a patient. That strikes me as being a fundamentally different question that needs an analytical framework apart from the Act.

My colleagues state that Fleming's complaint alleges medical malpractice. One supreme court case, *Dodson v. Charter Behavioral Health System of Northwest Arkansas, Inc.*, 335 Ark. 96, 983 S.W.2d 98 (1998), supports their view in some respect. But *Dodson* does not have a clear holding that we can apply to this case—meaning the case does not expressly address and hold that a claim arising from a doctor-patient relationship that results in the patient fatally shooting a third party is an "action for medical injury" under the Act. *Dodson* is procedurally different than this case, it answered different questions, and it recites both an ordinary-negligence standard and the duty owed under the Act. *Dodson* is not a case that squarely addressed and answered the characterization issue that this case presents.

I agree with my colleagues that the definition of "medical injury" is a broad one. Ark. Code Ann. § 16-114-201(3) (Supp. 2015). But the definition should not include every conceivable "adverse consequence" that arises once a medical-care provider begins to treat a patient. Ark. Code Ann. § 16-114-201(3). Every legal concept should have its practical limit. As one court has put it:

While it may seem that there should be a remedy for every wrong, this is an ideal limited perforce by the realities of this world. Every injury has ramifying consequences, like the rippling of the waters, without end. The problem for the law is to limit the legal consequences of wrongs to a controllable degree . . . . [Accordingly] [t]he final step in the duty inquiry . . . is to make a determination of the fundamental policy of the law, as to whether the defendant's responsibility should extend to such results. *Jaworski v. Kiernan*, 696 A.2d 332, 336 (Conn. 1997).

A troublesome point with applying the Medical Malpractice Act in this case is that the shooting itself must arguably be the actionable "adverse consequence." Because until Lands shot Fleming, the latter man was not "injured" by Dr. Vest's treatment of Lands. Yet how can the violent, intentional act that Lands committed against Fleming equate to a medical injury? To so conclude injects a legal fiction into an area of the law where one is not needed to carry out the general assembly's intent, in real-world affairs.

The law of unintended consequences may have just been triggered. Applying the Act in a case like this one arguably undermines the general assembly's main reason for promulgating the Act, because it seems to expand the potential tort liability that medical-care providers could face. *See* Act of Apr. 2, 1979, No. 709, § 11, 1979 Ark. Acts 709 (Emergency Clause); *see also Jarmie v. Troncale*, 50 A.3d 802, 808 (Conn. 2012) (expanding the liability of health care providers [under a medical-malpractice act] would not reduce the potential for harm because health-care providers would be required to do no more than they already must do to fulfill their duty to patients).

Contrary to my colleagues' decision, the better approach is to tether medical-malpractice claims to adverse consequences that arise from a medical-care provider/patient relationship. This is the traditional approach, one this court and our supreme court have followed before. *See Chatman v. Millis*, 257 Ark. 451, 453, 517 S.W.2d 504, 505 (1975);

*see also Thompson v. Sparks Reg'l Med. Ctr.*, 2009 Ark. App. 190, at 5, 302 S.W.3d 35, 38 ("The broad holding of *Chatman* is that a medical provider owed no duty to a person who was not its patient."). The so-called traditional approach does not, of course, necessarily mean that Dr. Vest would owe a duty to Fleming.

What duty, if any, did Dr. Vest owe to Fleming under the circumstances? That is the fighting issue in this case, and courts have split over this question since the seminal case *Tarasoff v. Regents of University of California*, 551 P.2d 334 (Cal. 1976). Arkansas's common law does not generally recognize a duty to control the actions of another person "even if the former has the practical ability to govern the latter." *Trammell v. Ramey*, 231 Ark. 260, 262, 329 S.W.2d 153, 154 (1959). This general rule does not usually apply when there is a special relationship between the parties. *See Keck v. Am. Emp't Agency, Inc.*, 279 Ark. 294, 652 S.W.2d 2 (1983). The Restatement of Torts states, "One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm." Restatement (Second) of Torts § 319. So under the Restatement approach, a psychiatrist may owe a duty to a person when the risk of harm to the person is foreseeable. State courts vary in how they approach third-party harm cases; some are quite nuanced and fulsome in their treatment of the question. *See, e.g., Estates of Morgan v. Fairfield Family Counseling Ctr.*, 673 N.E.2d 1311 (Ohio 1997) (holding that a psychotherapist must protect against or control a patient's violent propensities and that a "professional-judgment standard" applied); *Jarmie v. Troncale*, 50 A.3d 802, 808 (Conn. 2012) (third-party claim against a doctor for failure

to warn failed as a medical-malpractice claim because the person harmed and the doctor did not have a physician-patient relationship); *see also Civil Liability of Psychiatrist Arising out of Patient's Violent Conduct Resulting in Injury to or Death of Patient or Third Party Allegedly Caused in Whole or Part by Mental Disorder*, 80 A.L.R.6th 469 (2012) (collecting cases).

This case brings Arkansas to an important judicial crossroads: will our courts continue to expand the Act's definition of what constitutes a "medical injury" and thus pull more providers into the Act's orbit? Or will they begin taking a more nuanced approach, especially in cases where a medical-care provider's patient commits an intentional harm upon a third person, and more carefully analyze whether a provider can be sued in tort at all?

I express no opinion on the merits of the complaint, nor whether a duty in tort exists. My point here is solely that the Medical Malpractice Act—and the law that goes hand-in-glove with it—does not apply. So I would not apply the Act's two-year limitations period or the continuous-treatment doctrine. It also means that the circuit court should be directed to address, as a matter of law, whether a tort-based duty runs from Dr. Vest to Fleming apart from the Act. How it would determine whether a duty exists apart from the Act is for the parties to argue and the circuit court to decide. *Compare Coca-Cola Bottling Co. of Memphis, Tenn. v. Gill*, 352 Ark. 240, 257, 100 S.W.3d 715, 725 (2003) (existence of a legal duty is a question of law and requires that the defendant be able to reasonably foresee an appreciable risk of harm to others), *with Estates of Morgan, supra*; *Jarmie, supra*.

14

The circuit court's decision to grant quasi-judicial immunity to Dr. Vest should be reversed. But because this case has the flesh of a medical-malpractice case—but not its heart and bones—I would also reverse the decision to apply the Act and remand this case for further proceedings.

*Bridges, Young, Matthews & Drake PLC*, by: *John P. Talbot*, for appellant.

*Friday, Eldredge & Clark, LLP*, by: *T. Michelle Ator* and *Edie R. Ervin*, for appellee.