KENNETH S. HIXSON, Judge
Appellant Meranda Martin, Successor Special Administratrix of the Estate of Virgil Brown, Jr., Deceased, appeals after the Pulaski County Circuit Court granted summary judgment in favor of appellee, Dr. Leslie Smith, based on the application of quasi-judicial immunity. Martin's sole point on appeal is that the circuit court erred in granting summary judgment and dismissing her complaint against Dr. Smith. We affirm.
The record reflects that in January 2004, Kenneth McFadden was acquitted of third-degree battery, second offense, against his then girlfriend by reason of mental disease or defect. He was admitted to the Arkansas State Hospital but was released on March 31, 2004, pursuant to a conditional-release order (CRO), pursuant to Act 911 of 1989, codified at Arkansas Code Annotated sections 5-2-310 and 5-2-313 to -315 (Repl. 2013 & Supp. 2017). One of the requirements for a conditional release is that the circuit court order a person to be in charge to, inter alia , monitor the person acquitted and keep the circuit court apprised of that person's compliance with the conditions of his release including, but not limited to, the person's compliance with the court-ordered prescribed regimen of medical, psychiatric, or psychological care or treatment. Ark. Code Ann. § 5-2-315(e). The reason for the monitoring and reporting requirement is that the circuit court has continuing jurisdiction over the acquitted person. Ark. Code Ann. § 5-2-315(e)(3)(C). A circuit court retains the authority to determine whether the person acquitted should be remanded to an appropriate *789 facility on the ground that, in light of his or her failure to comply with the prescribed regimen of medical, psychiatric, or psychological care or treatment, his or her continued release would create a substantial risk of bodily injury to another person or serious damage to property of another person. Ark. Code Ann. § 5-2-315(e)(3)(C)(ii).
McFadden's initial conditional release was revoked in October 2006 because of his noncompliance with the terms of the CRO. McFadden was again released pursuant to a CRO entered in September 2007 to live in a residence in Corning, Arkansas, with Mid-South Health Systems as the court-appointed responsible agency. In October 2009, the CRO was modified by agreement, and McFadden was placed in a residence in North Little Rock, Arkansas, with his mother. The Craighead County Circuit Court appointed Gain, Inc. (Gain),[1] as the responsible agency and transferred its continuing jurisdiction to the Pulaski County Circuit Court. Gain's medical director and treating psychiatrist was Dr. Leslie Smith. In July 2010, the circuit court granted Gain's motion to allow McFadden to move from his mother's residence to an apartment in North Little Rock. Then, in March 2011, Gain filed another motion to allow McFadden to move to an apartment in Little Rock, Arkansas, which was granted. McFadden shared this apartment with Virgil Brown and a third roommate. McFadden, Brown, and the third roommate were all patients of Dr. Smith, although McFadden was the only Act 911-CRO participant.
Dr. Smith evaluated and treated McFadden from 2009 through November 2011. Dr. Smith and other Gain personnel regularly kept the circuit court apprised of McFadden's condition and compliance with the treatment regimen. On November 30, 2011, while under the evaluation and treatment of Dr. Smith, McFadden brutally murdered his roommate, Virgil Brown. Appellant Martin, the authorized representative of Brown's estate, filed a lawsuit against Dr. Smith and others alleging, in relevant part, that Dr. Smith was negligent in his diagnosis, evaluation, and treatment of McFadden, which resulted in Brown's death. Dr. Smith subsequently filed a motion for summary judgment alleging he was entitled to quasi-judicial immunity because he was acting within the scope of his charge by the circuit court. The circuit court granted summary judgment in favor of Dr. Smith, explaining that
Dr. Smith is entitled to quasi-judicial immunity and is immune from suit because his treatment and medical care of Mr. McFadden arose solely from the conditional release order and his treatment and medical care was within the scope of that order. See Chambers v. Stern , 338 Ark. 332 [994 S.W.2d 463]. Considering the facts in this case, I find Fleming v. Vest , 2015 Ark. App. 636 [475 S.W.3d 576], to be inapplicable.
I have considered the response of plaintiff and find that plaintiff has not met proof with proof. Plaintiff's arguments do not refute the argument of Dr. Smith that quasi-judicial immunity applies in this case. Dr. Smith is entitled to summary judgment as a matter of law. The complaint against Dr. Smith is hereby dismissed with prejudice.
The order contained a proper certificate pursuant to Arkansas Rule of Civil Procedure 54(b), explaining the necessity of an immediate appeal, and this interlocutory appeal followed.[2]
*790 A circuit court may grant summary judgment only when it is apparent that no genuine issues of material fact exist requiring litigation and that the moving party is entitled to judgment as a matter of law. Blevins v. Hudson , 2016 Ark. 150, 489 S.W.3d 165. Once the moving party has established a prima facie entitlement to summary judgment, the opposing party must meet proof with proof and demonstrate the existence of a material issue of fact. Id. We view the evidence in the light most favorable to the party against whom the motion was filed, resolving all doubts and inferences against the moving party. Id. The burden is not on the moving party to demonstrate that every fact is undisputed, but to show that reasonable minds could not differ as to the conclusion to be drawn from them. Id. Summary judgment is also appropriate when the circuit court finds that the allegations, taken as true, fail to state a cause of action. Id. The issue of whether a party is immune from suit in a summary-judgment procedure is purely a question of law, and this court reviews that issue on appeal de novo. Early v. Crockett , 2014 Ark. 278, 436 S.W.3d 141.
Martin argues that the circuit court erred in granting summary judgment to Dr. Smith based on quasi-judicial immunity because the commitment process for McFadden had long been completed, and Dr. Smith was not an integral part of the judicial process. Martin devotes a portion of her brief to a discussion of the merits of her underlying action. However, that is not before us.[3] Martin further discusses several cases from other jurisdictions in which quasi-judicial immunity has not been granted under similar circumstances. Martin additionally argues that public-policy considerations do not weigh in favor of granting a psychiatrist quasi-judicial immunity under these circumstances. However, Martin's reliance on jurisprudence from other jurisdictions and her argument regarding public-policy considerations is unpersuasive when our supreme court has already addressed these issues, and we are bound by our supreme court precedent and lack the authority to reach a contrary result. See Ferguson v. Ferguson , 2009 Ark. App. 549, at 9, 334 S.W.3d 425, 430.
The seminal case in Arkansas regarding the granting of quasi-judicial immunity to a psychiatrist is Chambers v. Stern , 338 Ark. 332, 994 S.W.2d 463 (1999) ( Chambers I ). Chambers I was a divorce and child-custody case. The circuit court ordered Dr. Stern to evaluate and treat the parties and their children. Id. Four years later, Dr. Stern was still treating the family members. Id. The father filed a lawsuit against Dr. Stern for alleged malpractice that was committed "during the therapy or 'treatment' phase with the family members." Id. at 334, 994 S.W.2d at 464. Dr. Stern sought a dismissal, which the circuit court granted, on the basis that he was entitled to quasi-judicial immunity because he was acting within the scope of the circuit court's order. Id. The case was appealed to our supreme court. The Chambers I court held that "a court-appointed physician is entitled to judicial immunity so long as he was serving an integral part of the judicial process by carrying out and acting within the scope of a court's order. "
*791 Chambers I , 338 Ark. at 338, 994 S.W.2d at 466 (emphasis added). Our supreme court noted that public-policy considerations compelled it "to extend judicial immunity to court-appointed therapists. Psychologists and other experts would be reluctant to accept appointments if they were subject to personal liability for actions taken in their official capacities." Id. at 338, 994 S.W.2d at 466.[4]
Therefore, the issue before us is whether Dr. Smith, at the time of any alleged negligence or malpractice herein, was serving an integral part of the judicial process by carrying out and acting within the scope of a court's order. If the answer is "yes," then Dr. Smith is entitled to quasi-judicial immunity. An Act 911 conditional release cannot be ordered without a person being appointed "to be in charge" to monitor the person acquitted as set forth in the statutory scheme discussed above. Ark. Code Ann. § 5-2-315. The appointment of the person in charge is clearly an integral part of the CRO-release process. Here, it is clear that Dr. Smith was serving an integral part of the judicial process by carrying out and acting within the scope of a court's order. Gain was appointed by the circuit court as the responsible agency for the acquitted person, Kenneth McFadden, pursuant to Arkansas Code Annotated section 5-2-315(e). Dr. Smith was the medical director and treating psychiatrist for Gain. The records indicate that Dr. Smith had been treating and monitoring McFadden pursuant to the CRO from 2009 up to, and including, the date of Virgil Brown's murder. Further, Gain and Dr. Smith were keeping the circuit court apprised of McFadden's condition and compliance. Thus, under Chambers I , Dr. Smith was serving an integral part of the judicial process by carrying out and acting within the scope of a court's order and is entitled to quasi-judicial immunity.
Martin also argues that Dr. Smith is not entitled to quasi-judicial immunity because Dr. Smith was not specifically named in the CRO-only Gain was specifically named. She therefore argues that the facts of this case are identical to those in Fleming v. Vest , 2015 Ark. App. 636, 475 S.W.3d 576. We, however, find the facts of Vest to be distinguishable.
Vest, interestingly enough, is an Act 911 conditional-release case. In Vest , a CRO was filed by the circuit court, and the person acquitted, as in our case, subsequently murdered a victim. Id. The deceased's estate filed a lawsuit against Dr. Vest. Id. Dr. Vest moved to dismiss the complaint, alleging that he was entitled to quasi-judicial immunity as set forth in Chambers I . Id. The circuit court agreed and dismissed Dr. Vest. Id. On appeal to our court, we reversed the granting of quasi-judicial immunity, holding that "[t]he court [conditional-release] orders never identify [the treating psychiatrist], and he confirmed in his deposition that he never communicated with the circuit court." Vest , 2015 Ark. App. 636, at 9, 475 S.W.3d at 582. Of particular import, however, is that our Vest court did not hold that quasi-judicial immunity did not apply to Act 911 CROs; rather, our court held that there was no evidence that Dr. Vest was identified as the treating psychiatrist. Id.
Apparently in Vest , the psychiatrist did not communicate at all with the court as *792 contemplated by the conditional-release statutory scheme. In contrast here, although "Gain, Inc.," was identified as the "responsible agency" in the CRO, it is uncontradicted that Dr. Smith was the medical director of Gain and was also McFadden's treating psychiatrist. Further, and perhaps more importantly, Dr. Smith clearly communicated with the court directly in two letters concerning McFadden's mental and medical condition and his compliance with the court-ordered regimen; Dr. Smith was copied on five other letters to the court, which indicated that Dr. Smith was the treating "GAIN Psychiatrist." One of the letters written by Dr. Smith to the circuit court explained that McFadden had become more psychiatrically unstable and that his schedule had been modified to five days a week. The other letter described McFadden's ostensible violent actions of kicking in his roommate's door. The two letters written by Dr. Smith and the five letters written to the circuit court on which Dr. Smith was copied show that, unlike the psychiatrist in Vest , Dr. Smith was not a stranger to the court, that the circuit court was aware that Dr. Smith was the treating psychiatrist, and that Dr. Smith had been communicating with the court pursuant to the circuit court's CRO. As such, Vest is distinguishable, and appellant's reliance thereon is misplaced. Thus, the summary-judgment order granting quasi-judicial immunity to Dr. Smith is hereby affirmed.
Affirmed.
Gladwin, Klappenbach, Murphy, and Brown, JJ., agree.
Harrison, J., dissents.
Dr. Smith should not be receiving judicial immunity in this case. Therefore, I respectfully dissent. The majority and I agree that whether he met the applicable professional standards of care or any other duty owed is not now at issue.
Regarding the question that is before us, the lone case on which the majority relies cannot adequately support the decision to immunize mental-health practitioners who treat the conditional-release population. To put the majority position into perspective, my research has not revealed one case in this country where a court has clothed a psychiatrist, on similar facts, with the type of immunity Dr. Smith received today.
Arkansas stands as a minority of one. Time will tell whether its privileged position will be short or long lived.
About the case on which the majority hangs all, I disagree that Chambers v. Stern controls as a matter of stare decisis , which is shorthand for the maxim "to stand by things decided and not disturb settled points." Bryan Garner, et al., THE LAW OF JUDICIAL PRECEDENTS 5 (Thomson Reuters 2016). Just what did the supreme court "settle" in Chambers ? It could not have settled the question of constitutional importance this case presents, because Chambers involved a materially different fact pattern and legal context. The majority may well be correct, but I lack its confidence that our supreme court would cite Chambers , extend its reach into this new realm, and end the case. Whatever importance one attaches to Chambers , at least the psychiatrist who received judicial immunity there was individually named in the court order, and the court had expressly delegated a classical judicial function (determining divorcing parents' visitation rights with children) to the psychiatrist.
The opposite happened here. Dr. Smith was not personally appointed in a judicial order. He was not expressly delegated a traditional judicial function. Yet performing a traditional judicial function is *793 the polestar in determining whether someone qualifies for judicial immunity. E.g. , Cleavinger v. Saxner , 474 U.S. 193, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985) (applying a "functional" analysis).
Numerous court decisions across this country have protected mental-health professionals when they make mental-competency recommendations to courts, who must in turn decide whether a defendant may proceed under the "normal" course of the criminal laws. E.g. , Seibel v. Kemble , 63 Haw. 516, 631 P.2d 173 (1981). Some decisions involve courts relying on mental-health professionals to give opinions in the child-custody or visitation realm, as our supreme court did in Chambers .[1] It is a mistake, however, to hold that a psychiatrist performs a judicial function when his or her primary role is to treat a patient according to professional standards of care in the field of psychiatry, for example-an endeavor that is not integral to how the judiciary functions. If the Arkansas General Assembly chooses to evaluate the issue and expressly immunizes health-care personnel who treat Act 911 participants like Kenneth McFadden, then we have a different case. If the Arkansas Supreme Court evaluates the issue in a case on point and expressly confers immunity, then we have a different case. But this court should not award judicial immunity to Dr. Smith, not today.
Arkansas's Medical Malpractice Act does not give tort immunity to any type of health-care provider, in any field of practice. The majority also overlooks that the General Assembly has arguably taken a policy position opposite its stance. In 2013, our legislature enacted Ark. Code Ann. § 20-45-202 (Repl. 2014), which addresses the psychiatrist/patient/third-party-harm intersection. The statute presumably balanced relevant and competing societal interests, and the General Assembly's final calculation-a difficult one to make and best left to it-was not to immunize any provider unless the required statutory steps had been taken. The statute did not give absolute immunity to any mental-health provider based solely on an affiliation with a certain program or patient population.
Still, Dr. Smith and similarly situated professionals retain substantial protection from at least some adverse consequences that may flow from treating the (sometimes) unstable and (sometimes) dangerous patients they encounter. Section 20-45-202 cuts a path to total immunity from "liability" or "suit" if certain steps are taken. Please take a moment to digest the statute.
(a) A mental health services provider, hospital, facility, community mental health center, or clinic is not subject to liability, suit, or a claim under § 19-10-204 on grounds that a mental health services provider did not prevent harm to an individual or to property caused by a patient if:
(1) The patient communicates to the mental health services provider an explicit and imminent threat to kill or seriously injure a clearly or reasonably identifiable potential victim or to commit a specific violent act or to destroy property under circumstances that could easily lead to serious personal injury or death and the patient has an apparent intent and ability to carry out the threat; and
(2) The mental health services provider takes the precautions specified in *794 subsection (b) of this section in an attempt to prevent the threatened harm.
(b) A duty owed by a mental health services provider to take reasonable precautions to prevent harm threatened by a patient is discharged, as a matter of law, if the mental health services provider in a timely manner:
(1) Notifies:
(A) A law enforcement agency in the county in which the potential victim resides;
(B) A law enforcement agency in the county in which the patient resides; or
(C) The Department of Arkansas State Police; or
(2) Arranges for the patient's immediate voluntary or involuntary hospitalization.
(c)(1) If a patient who is under eighteen (18) years of age threatens to commit suicide or serious or life-threatening bodily harm upon himself or herself, the mental health services provider shall make a reasonable effort to communicate the threat to the patient's custodial parent.
(2) If the mental health services provider is unable to contact the patient's custodial parent within a reasonable time, the mental health services provider shall make a reasonable effort to communicate the threat to the patient's noncustodial parent or legal guardian.
(d) A mental health services provider, hospital, facility, community mental health center, or clinic is not subject to liability, suit, or claim under § 19-10-204 for disclosing a confidential communication made by or relating to a patient if the patient has explicitly threatened to cause serious harm to an individual or to property under circumstances that could easily lead to serious personal injury or death or if the provider has a reasonable belief that the patient poses a credible threat of serious harm to an individual or to property.
(e)(1) If a patient in the custody of a hospital, community mental health center, or other facility threatens to harm an individual or property, the mental health services provider and the staff of the hospital, community mental health center, or other facility shall consider and evaluate the threat before discharging the patient.
(2) Under subdivision (e)(1) of this section, the mental health services provider may inform an appropriate law enforcement agency and the victim of the threat.
(f) Subsections (a) and (c) of this section apply to a hospital or facility that has custody of a patient who has made or makes a threat to harm an individual or property.
The circuit court did not address this statute. The majority has also remained mum. I grant the statute cannot decide this appeal with the certainty of 1 + 1 = 2; but it strongly suggests that the question of whether a psychiatrist may claim absolute immunity, out of the box, in a third-party-harm case (like this one), has been considered and rejected. At least regarding the Act 911 population, practitioners like Dr. Smith knowingly and consistently treat patients who have already shown a propensity to be dangerous to other people or property. Section 20-45-202(b) states that mental-health providers owe a "duty" "to take reasonable precautions to prevent harm threatened by a patient[.]" The General Assembly did not except from this duty providers who treat Act 911 participants. The statute did, however, strike what appears to be an express trade-off-practitioners who adequately attend to, and warn of, a "credible threat" to people or property receive, essentially, *795 immunity.[2] The statute therefore seems a relatively tight fit to this case, meaning it should be considered in this court's analysis when discussing Chambers 's precedential strength.[3]
This brings us to a point that the circuit court and the majority found highly important, if not critical, which is the policy statement in Chambers and the assumption underlying it. During the summary-judgment hearing, the circuit court essentially stated that if people like Dr. Smith are not given absolute immunity then they will not treat the Act 911 population. The circuit court's statement is well-intentioned, no doubt; and it likely sought to echo the reasoning in Chambers . The court may be right. Or wrong. No one knows. And that is a main concern here-rooting an absolute-immunity doctrine in a factually unsubstantiated statement about what could happen but has not yet happened and might never happen. We have no statement from psychiatrists (or a representative organization) advising that they begin and end their workdays concerned about, or plan career paths based on, Arkansas's judicial-immunity doctrine. While the majority has assumed a lot about mental-health professionals' motivations, I prefer not to guess given the tabula rasa before us.
Better that judges stick to the known. We know that no party gave the circuit court or this court any social-science data, testimony, or statement hinting that a provider-availability concern might suddenly ensue if judicial immunity is restrictively applied. We know not even Dr. Smith himself said that he will stop treating conditional-release patients unless he receives immunity. Given the facts, I am not persuaded that the policy statement can fuel an absolute-immunity doctrine. See Naidu v. Laird , 539 A.2d 1064 (Del. 1988) (affirming jury verdict against a state-hospital psychiatrist who was grossly negligent in releasing mental patient who subsequently killed another person in an automobile accident; rejecting for want of factual proof the policy argument from amici that a provider exodus would ensue absent immunity).
Whatever pressure the Chambers policy statement may exert, the premier policymaking body is the General Assembly. "[I]t must be remembered that courts do not make the state's public policy. It is their function to declare what it is, while the power inheres in the General Assembly of the state to declare what shall be the public policy of this state." Ross v. Rich , 210 Ark. 74, 78, 194 S.W.2d 297, 298 (1946). In my view, section 20-45-202 embodies a policy in tension with how the majority has applied Chambers .
Next observation. Neither the circuit court nor this court has deeply explained how Dr. Smith functioned like a judge under the conditional-release program.
McFadden was committed to the custody of the Arkansas Department of Human Services by statute. Ark. Code Ann. § 5-2-315(d) (Repl. 2013). An employee of DHS's Division of Behavioral Health Services was identified as the conditional-release monitor in all the written correspondence to the *796 circuit court. Ark. Code Ann. § 5-2-315(e). Gain, Inc.'s role, by court order, was as "the responsible agency for monitoring [McFadden's] compliance to his prescribed medication and treatment regime." But the order says nothing about Dr. Smith, which is unlike Chambers . Nor was Dr. Smith himself ever legally empowered to revoke McFadden's conditional release. Only the circuit court could do so. Ark. Code Ann. § 5-2-315(e)(3)(C)(ii) ("After a hearing, the circuit court shall determine whether the person acquitted should be remanded to an appropriate facility[.]").
Another legal point that pushes me away from the majority position is that, under conditional-release law, a treating psychiatrist has limited professional power over his patients. This is so because, by statute, the circuit court retains all power to modify or eliminate a care or treatment plan. Ark. Code Ann. § 5-2-315(e)(3)(D) ("At any time after a hearing ... the circuit court may modify or eliminate the prescribed regimen of medical, psychiatric, or psychological care or treatment.") In other words: the circuit court reigns supreme in all material aspects of the conditional-release program, including retaining the power to modify or eliminate a physician's care or treatment plan. Given this revelation, can there be a meaningful delegation of a core judicial function to health-care practitioners under Act 911?
I do not see it.
The statutes under which Gain, Inc. received McFadden, and Dr. Smith treated him, declare that Dr. Smith has no judge-like authority. How did the doctor himself perceive his role within the system? He told us during a deposition
I did not notify the Court [that McFadden had kicked in Brown's bedroom door] it would have already happened related to the program, GAIN. I evaluate the psychiatric status. It is GAIN's responsibility to notify the 911 monitor of this incident. I assess whether someone is psychiatrically responding to something, and should there be a change in medication.
I hear Dr. Smith saying that he sees himself for what he is: A treating physician, not a judicial actor.
The majority mentions that some compliance reports flowed from the DHS monitor (who is neither Dr. Smith nor Gain, Inc.) to the circuit court. Okay. And Dr. Smith jointly signed two letters that went to the circuit court from Gain, Inc. Okay. The burning question, however, is whether the doctor functioned as a judge.
Again, I do not see it.
A final task remains: We must consider the Constitution of the State of Arkansas. Article 2, section 13 provides, "Every person is entitled to a certain remedy in the laws for all injuries or wrongs he may receive in his person, property or character[.]" Ark. Const. art. 2, § 13 (1874). This is a first principle. The judicial-immunity doctrine, however, totally prevents Virgil Brown's family from at least seeking redress in a court of law for his violent death at McFadden's hands. Consequently, it must be applied with care and restraint.
* * *
Dr. Leslie Smith's service to Act 911 participants is commendable. But the legal decision to grant him judicial immunity on this record should be reversed. One distinguishable case and a handful of letters do not override this court's constitutional mandate to guard all citizens' ability to pursue a remedy for an alleged harm. Moreover, in my view, the Arkansas General Assembly has spoken since Chambers v. Stern was first issued, and the statute it enacted provides the superior guide on *797 when immunity should be conferred in this case's context.

Gain, Inc., is an acronym for Greater Assistance to those In Need, Inc.

There are remaining codefendants in this litigation; therefore, the Rule 54(b) certificate was properly filed to permit this interlocutory appeal.

The question concerning whether Dr. Smith is entitled to quasi-judicial immunity must be resolved before considering the merits of any negligence claim. Chambers v. Stern , 338 Ark. 332, 994 S.W.2d 463 (1999). This is true because quasi-judicial immunity provides absolute immunity from suit and would extend to any actions that were within the scope of his authority. See generally Blevins , supra.

Our supreme court remanded the case for further findings because the circuit court's order granting the dismissal failed to make specific written findings regarding whether Dr. Stern's actions were within the scope of his court-appointed capacity. Id. On remand, the circuit court concluded that Dr. Stern was acting within the scope of the divorce court's order and was therefore entitled to immunity. Our supreme court affirmed that decision in a subsequent appeal. Chambers v. Stern , 347 Ark. 395, 64 S.W.3d 737 (2002) (Chambers II ).

For a comprehensive and nuanced article on mental-health-provider liability issues, see J. Thomas Sullivan, Arkansas, Meet Tarasoff: The Question of Expanded Liability to Third Persons for Mental Health Professionals , 69 Ark. L. Rev. 987 (2017).

The enabling act was titled: "AN ACT TO REQUIRE A MENTAL HEALTH SERVICES PROVIDER TO WARN A LAW ENFORCEMENT AGENCY OF A CREDIBLE THREAT BY A PATIENT; AND FOR OTHER PURPOSES." Its subtitle was: "TO REQUIRE A MENTAL HEALTH SERVICES PROVIDER TO WARN A LAW ENFORCEMENT AGENCY OF A CREDIBLE THREAT BY A PATIENT." H.B. 1746, 89th General Assem., Reg. Sess. (Ark. 2013).

Whether Dr. Smith or anyone else met Ark. Code Ann. § 20-45-202's requirements is not before this court in this appeal.